**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA CIVIL DIVISION**

CASE NUMBER: 12-CV-2923-VMC-TGW

GREAT LAKES REINSURANCE (UK) PLC,

    Plaintiff/Counter-Defendant,

v.

KAN-DO, INC.,

    Defendant/Counter-Plaintiff.
_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

KAN-DO, Inc. submits this memo in opposition to Great Lakes' Motion for Summary Judgment.

### I. - LEGAL STANDARD

It is well known that summary judgment is appropriate only where there is no genuine issue or dispute remaining regarding the facts of a case. Celotex Corp v. Catrett, 477 U.S. 317 (1986). Importantly, summary judgment should be granted "only when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Sobel v. Hertz Corp., 291 F.R.D. 525, 531 (D.Nev. 2013) (citing Fed.R.Civ.P. 56(c)). The party moving for summary judgment bears a burden of proving to the court that there is no genuine issue of material fact by informing the court of the basis for its motion, and by providing evidence to support its position. Id.

The Eleventh Circuit has specifically explained its standard for considering a summary judgment motion:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary Judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.

Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir.1982) (internal citations omitted); see also Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502 (11th Cir.1985), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

A fact is said to be "material" when it is a fact that under the governing law could affect the suit's outcome. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate when reasonable minds may differ on the material facts that are at issue. See v. Durang, 711 F.2d 141, 143 (9th Cir.1983). Finally, a dispute of material fact is regarded as genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505 (1986).

## II. - FACTUAL BACKGROUND

The KAN-DO was a 51-foot Bluewater that was built in 1989, with twin 270 horsepower engines whose hull was insured by Great Lakes Reinsurance (UK) PLC for $77,622.00 See Doc. 1, Exhibit B (insurance policy). Kan-Do, Inc.'s

2

principals were Frank Kunnen and his adult children, Laura Lyons and Guy Kunnen. Before coverage was first underwritten in 2009, the KAN-DO was surveyed that year by marine surveyor William Schiffner. Doc. 38, page 6. When Mr. Schiffner surveyed the boat in 2009 he said it looked like it was being maintained. Doc 38, page 11.

In late October 2012 the boat, was pulled out of the water for an updated insurance inspection by surveyor Schiffner and for bottom painting. Doc.35, page 6. Surveyor Schiffner began the updated insurance survey on the KAN-DO on October 23, 2012. Doc. 38, page 10. On this day, the boat was pulled out of the water. Doc. 38, page 10. Surveyor Schiffner completed the "out of the water", and part of his survey and found no deficiencies. Doc. 38, page 10. He did not get to do the "in water" portion of the survey because the boat sank. Doc. 38, page 17.

Mr. James Carlevatti, the general manager of Port Tarpon Marina (where the KAN-DO was docked) operated the travel lift both when the boat was removed from the water and when it was "splashed" (put back into the water) again. Doc 35, page 6. The boat was not leaking when it was pulled and was set on the blocks and Mr. George Luna did a bottom paint job on it. Doc. 35, page 6. Joey Kaminski was the captain who moved the KAN-DO from its slip at Port Tarpon Marina to the travel lift so it could be pulled out of the water. Doc. 37, page 12. Mr. Kaminski is the captain of a stone crab boat and a sport fishing boat. Doc. 37, page 8. Captain Kaminski docks one of his boats three slips down from where the KAN-DO was docked. Doc. 37, page 11. Before moving the KAN-DO, Captain Kaminski disconnected the shore power cord. Doc. 37, page 13.

After the boat was serviced out of the water, Captain Kaminski was asked to move the boat back to its slip.  Doc. 37, page 18.  When the boat was lowered back into the water and still in the travel lift slings, Captain Kaminski opened up various hatches to inspect and see if any water was coming into the KAN-DO.  Doc. 37, page 19.  He opened the lazarette in the back of the boat, and both engine hatch covers.  Doc. 37, page 19.  He also inspected the forward bilge area. Doc. 37, page 20.  Captain Kaminski did not observe any rushing water coming into the boat.  Doc. 37, page 20.  He did not see water leaking by the rudders or shaft logs.  Doc. 37, page 21.  There was no standing water or running water.  Doc. 37, page 22.  The boat's packing glands normally have three drips a minute (three to five when running), and he saw no drips.  Doc. 37, page 22.   Mr. Carlevatti also reported that Kaminski looked in all the hatches and said everything looked good so the boat could go back to its slip.  Doc. 35, page 10.

      Captain Kaminski pulled the KAN-DO back into its slip, tied it up and hooked it up to shore power.  Doc. 37, page 22.  He checked that there was power to all three bilge pumps (forward, mid and rear).  Doc. 37, page 23. Captain Kaminski plugged in the shore power and everything "kicks on".  Doc. 37, page 24.  All instruments powered back on and nothing tripped a breaker, nothing popped off, and the indicator showed him that power was on to the panel.  Doc. 37, page 24.  The AC power (alternating current) came on to the panel, which powered the indication gauge and showed that the battery charger came on. The three switches for the bilge automatic system were also in the on position.  Doc. 37 , page 24. When Captain Kaminski left the boat the three bilge pumps were on automatic and no water was being pumped out of the bilge.  Doc. 37, page 25.  He

4

further stated there was no water in the bilge because the lazarette stayed open the whole trip (back to the slip).  Doc. 37, page 26.  The back of the boat is the lowest part of the bilge and it was dry with no water running inside it.  Doc. 37, page 26.

Mr. James Carlevatti of Port Tarpon Marina received word on Monday (November 5, 2012) that the KAN-DO was low in the water.  Doc. 35, page 11.  He had some of his men head out with some pumps, but they could not find a connector to use the large pump.  Doc. 35, page 11.  Mr. Carlevatti did not think the KAN-DO was in that much trouble so he headed out to Home Depot to get a connector for his large pump.  Doc. 35, page 11.  Before he got to Home Depot he received word that the KAN-DO sunk.  Doc. 35, page 12.

Captain Kaminski also received a call from a person at the marina that the KAN-DO was sinking.  Doc. 37, page 28.  After the boat sunk, was refloated, and was pulled out of the water, Captain Kaminski observed that neither of the nuts on either side of the stuffing boxes (packing glands) had backed off or loosened up.  Doc. 37, page 31.  He did not see any exorbitant amount of water coming out of the stuffing boxes that would justify the boat sinking.  Doc. 37, page 31.  The boat had three Rule 2000 gallon per hour pumps which total 6000 gallon per hour.  Doc. 37, page 31.  The boat should have been able to pump out the water coming in.  Doc 37, page 31.

Captain Kaminski has installed roughly 60 of these stuffing boxes in his experience with boats.  Doc. 37, page 32.  These stuffing boxes are not dripless.  Doc. 37, page 32.  They are designed to drip for purposes of cooling and lubrication.  Doc. 37, page 33.  The system on the boats is considered a

5

management system because it is certain that water is going to be coming in the boat in a small, minute amount; the owner then needs to manage the water coming in. Doc. 37, page 33.

After the sinking, Kan-Do, Inc. made a claim against its insurance company, Great Lakes.

### III. - THE CLAIM AND RELEVANT POLICY TERMS

When discussing and referring to the insurance policy in this section, all references are made to the insurance policy that is part of the record and can be found at Doc. 1, Exhibit B.

The KAN-DO sank on November 5, 2012. Doc. 1, page 3. The insured, Kan-Do, Inc., has made a claim for a loss that occurred within the policy period of November 18, 2011 to November 18, 2012. The policy has been stipulated as being an "all risk policy". Doc. 29, page 5. A claim has been made for the following losses:

1. Total constructive loss of the vessel KAN-DO which is $77,622.00.
2. Salvage expenses claimed by:
   a. Sea Tow for $10,400.00, and
   b. Port Tarpon Marina for $472.85.
3. Personal property aboard the boat, which exceeded the $10,000.00 limit of the policy.
4. Attorney's fees pursuant to F.S. 627.428. See Doc. 4.

6

Great Lakes has moved for summary judgment based on Count One ("no accident") and Count Four ("no coverage for the engine unless external physical loss") of its complaint.

The relevant clause to be reviewed is found under section 3. <u>"Coverage A, Hull, Machinery, Equipment and Dinghy</u>". The policy states in part" "we provide coverage for accidental physical loss of, or accidental physical damage to the Scheduled Vessel which occurs during the period of this insuring agreement" Under the definitions page of the policy, there is <u>no</u> definition of "accidental physical loss". The record demonstrates that a fuse blew causing the aft bilge pump not to work which constitutes an accidental physical loss of the boat and Great Lakes' motion should be denied.

The next relevant clause that is raised as a defense to coverage is the warranty of seaworthiness. That is found under section 9 of the policy: "<u>9. General Conditions & Warranties</u>". There <u>is</u> a definition of "seaworthy" which is found in the "<u>1. Definitions</u>" section of the policy.

Interestingly, the insurance company fails to quote or refer to the definition of "seaworthy" in its motion for summary judgment. The definition is:

> k) "Seaworthy means fit for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use."

See Doc. 1, Exhibit B.

Kan-Do, Inc. respectfully submits that the definition of "seaworthy" in the policy, coupled with the facts of the sinking, create a factual issue, which remains

7

for trial. Specifically, the record evidence demonstrates that Kan-Do, Inc. maintained the boat in a reasonably proper and suitable condition for its intended use.

Both of these two issues, (1) whether there was an "accidental physical loss of the vessel" and (2) whether the KAN-DO was "reasonably" proper and suitable for its intended use, will be further discussed below in this memorandum.

### IV. - KAN-DO'S SINKING WAS FORTUITOUS AND SHOULD HAVE BEEN COVERED UNDER THE ALL RISK POLICY

When considering "all risk" policies' coverage of "accidental losses", such as the policy in the present case, federal courts have held that all losses deemed fortuitous are covered. Centennial Insurance Co. v. Lithotech Sales, LLC, 187 F. Supp. 2d 214, 219 (D.N.J. 2001). A loss is considered fortuitous unless it is the result of "an inherent defect, ordinary wear and tear, or intentional misconduct of the insured." Id.

The burden of proving fortuity is not an onerous one. International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Insurance Company, 944 F. Supp. 886, 893 (M.D. Fla. 1996). The court looked to the Restatement of Contracts when defining a fortuitous event:

> The Restatement of Contracts, Section 291, comment a (1932), defines a fortuitous event as:
>
> an event, which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, such as the loss of a vessel, provided that the fact is unknown to the parties. Id.

8

The court further stated that "a loss is not considered fortuitous if it results from an inherent defect in the subject damaged, from ordinary wear and tear, or from the intentional misconduct of the insured." Id. 892-893. However, negligence of the insured or his agents is generally held to be fortuitous and covered by an "all risk" policy unless there is an express exclusion. Id. at 893. "Fortuitous events are accidents or casualties of the seas, unforeseen and unexpected events, and are not losses occasioned by the incursion of water into a vessel's hull owing to defective, deteriorated or decayed condition of the hull or ordinary wear and tear." Id.

So, what are the disputed factual issues requiring decision by the trier of fact with respect to whether the KAN-DO's sinking was an accident or fortuity? In its motion, Great Lakes argues that the "cause of the loss is consistent with water ingress through the port shaft gland. The gland had been fully tightened, which is consistent with worn packing." Doc. 28, paragraph 17. However, Christopher Mills' report (Doc. 28, Exhibit C) (which is not a sworn declaration or affidavit) demonstrates he never opened up the packing gland on the port engine to see how much packing was there. This is Great Lakes' sole argument on "wear and tear" issue. Mr. Mill's observation and conclusion is that "the batteries discharged or wore down and the water could not be pumped out". Doc. 28, Exhibit C.

Captain Kaminski stated that this amount of water coming into the boat through the shaft gland is normal and is part of the water management system. Doc. 37, page 33. Kaminski also said that the bilge pumps are designed to easily handle this amount of water ingress. Doc. 37, page 31. Naval Architect Dan

9

Avoures also concluded this. Doc 39. Mills noted the water coming out of the packing gland was one quart every 5.5 minutes. Doc 28, Exhibit C. That would be 10.9 quarts every hour (or 2.725 gallons/hour). Mills notes that the boat sitting in the water would increase this rate of inflow. However, the bilge pump in the stern was rated 3700 gallons per hour. Doc 28, Exhibit C. Captain Kaminski contradicts Mr. Mills' conclusion regarding the shaft gland or stuffing box suffering from wear and tear and being worn. Captain Kaminski said this was normal. Mills said it was worn. That is a factual issue, which should be viewed in light most favorable to the non-movant, Kan-Do, Inc. The fact should be resolved at trial.

Further factual issues include the condition of the electrical protection system of the bilge pump system. Great Lakes' surveyor stated in his report that "[t]he bilge pump wiring and over current protection devices for each primary bilge pump were closely inspected and found in good order." Doc. 28, Exhibit C. He did not test the bilge pumps to see of they worked. Doc. 28, Exhibit C. Naval Architect Avoures contradicts Mr. Mills. Avoures, in fact, tested the aft bilge pump and noted it was working. He also found a blown fuse, which would have prevented the aft 3700 gallon per hour bilge pump from working. This is another disputed factual issue. The boat's normal bilge pumping operation was interrupted by a blown fuse.

No one knows when the fuse blew or why it blew. This is consistent with an accident or a fortuitous event that is sudden, unexpected and unforeseen. There are various possibilities for what caused the bilge pump's fuse to blow (see Avoures declaration Doc. 39) but this does not change the accidental and

10

fortuitous nature of the event. One could even make the case that Captain Kaminski should have done more than just verify that power was on to the bilge pumps when he put the boat back in the slip. He should have manually tested each pump to make sure it was working and his failure to do so was negligent. Thus his negligence would also be a covered loss under the law with an "all risk" policy. Id. at 893. This type of loss and accident is precisely why people choose to insure their property; to protect themselves from unforeseen and unexpected events (including blown fuses on bilge pumps).

In another marine insurance case that is remarkably similar to the instant case, the court denied the insurance company's motion for summary judgment, which claimed that the insured vessel sank because of gradual deterioration (wear and tear), which was excluded under the policy. Blythe v. Essentia Insurance Company, 2013 U.S. Dist. LEXIS 180326 (N.D. OK. 2013). In Blythe, the parties were insured with an "all risk" policy. The court noted that one witness said it is normal for wooden hull boats to accumulate water in the bilge, which is ordinarily removed by a bilge pump. Id. at *9 and *10. The Blythe's boat was also hooked up to shore power that would have pumped out accumulated water in the bilge. The court in Blythe concluded "Here, as noted, the Blythe's boat was connected to shore power, making the loss of power to the bilge pump far more unexpected and unexplained. Id. at *11. In denying the summary judgment motion, the court stated, "a jury could readily find that it was the interruption of power to the bilge pump which caused the sinking of the boat, and that the loss of the boat was therefore fortuitous and not covered by a policy exclusion." Id. at *10. What is also similar to this case is that in Blythe the

surveyor sent out by the coverage denying insurance company did <u>not</u> review the Blythe's maintenance records, and did not conduct any testing of the boat's electrical system. <u>Id</u>. at *4. That is exactly how Great Lakes' surveyor came to his conclusions (without testing or review of maintenance records of the KAN-DO).

In yet another case, the insurance company's motion for summary judgment was denied because of factual issues, which remained to be determined. <u>Martin v. Great Lakes Reinsurance (UK) PLC</u>, 2010 U.S. Dist. LEXIS 841 (D. AZ 2010). The issue in <u>Martin</u> was whether the loss was caused by an unknown person who connected a hose to the boat, which caused flooding versus the "lack of maintenance" charge by insurer Great Lakes. <u>Id</u>. at *21. The summary judgment motion was denied. <u>Id</u>. at *22.

In its memo, Great Lakes cites <u>Great Lakes Reinsurance (UK) PLC v. Soveral</u>, 2007 AMC 672 (S.D. Fla. 2007), to support its motion. <u>Soveral</u> is easily distinguishable because in that case the batteries operating the bilge pump were <u>not</u> connected to a shore-side power source containing a battery charger. In the instant case the insureds always had the KAN-DO connected to shore power, so the bilge pumps always had power for the battery charger. The court in <u>Soveral</u> held that the rain filled up the boat and drained the batteries and that did not constitute an accident. Here, the accidental event was the fuse failing at some point in the time after the boat was set back into the water. Great Lakes states "all that occurred was that a fuse failed, as must be the case inevitably in the course of time." Doc. 29, page 7. Counsel's statement is just unsupported by any evidence. No expert has said "fuses blow inevitably". In fact, Great Lakes' surveyor, Mr. Mills, did not even know a fuse had blown.

12

On the contrary, in his declaration Naval Architect Avoures lists potential causes for a fuse to blow. See Doc. 39. Those events support an accidental event triggering coverage under the "all risk" policy.

The other case cited by the insurance company on the issue of fortuity is <u>Miller Marine Services, Inc. v. Travelers Property Casualty Ins. Co.</u>, 2005 U.S. Dist LEXIS 39906 (E.D. N.Y. 2005). That case is also easily distinguishable because the policy in question was a "named perils" type of policy, and the plaintiff was unable to raise a genuine issue of material fact as to whether the boat sank because of a peril of the sea or other reasons. <u>Id</u>. at *22. Plaintiff did not know why it sank. <u>Id</u>. Since plaintiff could not prove the loss was caused by the peril insured against (as required in a "named perils" policy) the loss was not covered. <u>Id</u>. Thus <u>Miller</u> is inapplicable to the instant case because the KAN-DO was covered by an "all risk" policy.

The sinking of the KAN-DO was not caused by an inherent defect, ordinary wear and tear, or intentional misconduct of the insured, and therefore the loss is covered under the "all risk" policy provided by Great Lakes. Clearly stated in Great Lakes' memorandum, "[t]he term "accident" has always been held to mean that an event is unexpected and unintended." On November 5, 2012, a fuse on the KAN-DO suddenly and unexpectedly blew, and once the vessel heeled to port, water came in via a "through hull" fitting, causing rapid incursion of water with no way out. On a boat that was maintained regularly, and which underwent inspection just a few days prior, a blown fuse surely is a "[h]appening by chance or accident[,] [o]ccurring unexpectedly . . . without known cause." *Black's Law Dictionary* 589 (5th ed. 1979).

### V. - THE OWNERS OF THE KAN-DO COMPLIED WITH THE POLICY: THE VESSEL AND CREW WERE REASONABLY PROPER AND SUITABLE FOR ITS INTENDED USE

Kan-Do, Inc. submits that all evidence suggests the KAN-DO was <u>reasonably</u> proper and suitable for its intended use. The intended use was as a pleasure boat.

Summary judgment is not appropriate for this case because there is also a genuine issue of material fact in dispute as to whether the KAN-DO was in a seaworthy condition at the time it sank. It is true that "a presumption of un-seaworthiness . . . arises upon a vessel's sinking while moored to a dock in calm water". <u>Markel American Ins. Co. v. Olsen</u>, 2013 U.S. Dist. LEXIS 75750, *26 (E.D. Mich. 2013). However, "[t]he **[s]tandard for seaworthiness** is not perfection, but **reasonable fitness**; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." <u>Id</u>. at *26 (emphasis supplied) (internal brackets omitted) (citing <u>Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.</u>, 376 U.S. 315, 322, 84 S. Ct. 748, 11 L. Ed. 2d 732 (1964) (internal quotations omitted)).

Great Lakes has cited <u>J & A Fleeting, Inc. v. Fireman's Fund Magee Marine Underwriters</u>, 2006 U.S. District. LEXIS 81 (E.D. KY 2006) in its motion. It is distinguishable because the boat in that case was known by the owner to have a serious water leak and was being kept afloat by "sump pumps". <u>Id</u>. at *6. In fact, the insured had ordered new parts to replace the parts that were leaking. <u>Id</u>. The evidence in the instant case from Captain Kaminski and Naval Architect Avoures

14

is that the small water ingress was normal, and the bilge pumps should have easily handled it.

In <u>Markel</u>, the vessel in question sank while moored at the dock in calm water due to a hose failure. <u>Id</u>. at *26-27. To overcome the presumption of unseaworthiness, the owner must produce evidence to the contrary; this will shift the burden back to the insurer. <u>Id</u>. at *26. To rebut the presumption of unseaworthiness, the vessel owner in <u>Markel</u> provided extensive evidence to show the routine maintenance completed on the vessel, along with evidence proving that the vessel owner was a "meticulous and conscientious boat owner who took great care" of the vessel. <u>Id</u>. at *14-15.

The evidence in <u>Markel</u> included testimony proving that the vessel owner spent significant resources on maintenance, regularly inspected and properly maintained the vessel, repaired or replaced parts when needed, and made sure that all maintenance was completed timely and appropriately. <u>Id</u>. at *15. The court found that the evidence provided by the vessel owner was enough to rebut the presumption that the vessel was unseaworthy when it sank. <u>Id</u>. (the burden then shifted back to the insurance company to prove unseaworthiness, which it was unable to do). The court ruled that because of the meticulous care the vessel owner took in maintaining his boat, he did not breach the express warranty of seaworthiness. <u>Id</u>.  The time and care that the vessel owner in <u>Markel</u> took to maintain his boat is mirrored in the facts of the present case involving the KAN-DO.

Other courts have routinely held that record evidence of keeping a boat's equipment in good repair serves as a basis for denying summary judgment

15

motions. See <u>Acadia Insurance co. v. Cunningham</u>, 771 F. Supp. 2d 172, 184 (D. Mass. 2011).  In denying the insurance company's motion for summary judgment, the <u>Acadia</u> court stated "viewing the evidence in Cunningham's favor, Chancey properly winterized the vessel…thus, a reasonable jury could find that Cunningham properly maintained the vessel's equipment and kept the equipment in good repair. <u>Id</u>. at 184.  In <u>Windsor Mount Joy Mutual Insurance Company v. Giragosian</u>, 57 F. 3d 50 (1st Cir. 1995) the appellate court affirmed a trial court's judgment, which held that the insured had used due diligence in maintaining the boat's seaworthiness.  It is seen in many cases that the trier of fact should have an opportunity to weigh the evidence at trial to see whether the insured boat owner did maintain his boat in a reasonably proper and suitable condition.  The very way the policy was written invites a weighing of what the boat owner did to make the boat seaworthy.  There is ample evidence for this court to deny Great Lakes' motion regarding the "unseaworthiness" issue.

Below is a summary by witness of the record evidence, which demonstrates that there is <u>clearly</u> a genuine issue of material fact as to whether the KAN-DO was "reasonably proper and suitable for its intended use".

Captain Joey Kaminski testified that Frank Kunnen was always there taking care of the boat, starting it up and running it.  Doc. 37, page 14.  He said Frank Kunnen came down almost every weekend.  Doc. 37, page. 15.  He said the KAN-DO owners were adamant about starting up the boat to be sure it was working properly.  Doc. 37, page 14-15.

16

Guy Kunnen's Declaration (Doc. 40) demonstrates that if his father Frank Kunnen was not checking on the boat after he got ill, that he, Guy Kunnen took over this responsibility. He stated exactly what he did, which was:

a. made sure the shore power was plugged in so that the batteries which ran the boat's three bilge pumps would always maintain their charge, and

b. started the generators, and

c. started the air conditioning, and

d. started both motors, including putting them both in forward and reverse, and

e. inspected the bilge compartments to make sure the bilge was dry, and

f. tested the bilge pumps to make sure they were working. See Doc. 40.

Surveyor Schiffner testified that when he surveyed the boat in 2009 it looked like it was being maintained. Doc. 38, page 11.

James Carlevatti, the manager of Port Tarpon Marina said that any time there was a problem with the boat, as far as he knew the boat was serviced. Doc. 35, page 4-6.

Perhaps most illustrative of the fact that the KAN-DO was well maintained and that the owners of the boat acted to keep the boat "reasonably proper and suitable", is the testimony and records of Wayne Brown, the owner of Brown's Marine Services. Mr. Brown testified he serviced the KAN-DO for over 15 years. Doc. 36, page 7, 12-15. He said Mr. Kunnen consistently checked on his boat, and that Frank Kunnen was very meticulous about coming down and inspecting the boat. Doc. 36, page 18. There was never a time where Mr. Brown made a

17

recommendation on repairing the boat someone did not authorize it or have it done. Doc. 36, page 18. Marine mechanic Wayne Brown's opinion is that the KAN-DO was properly maintained. Doc. 36, page 19.

Specifically, in just the last three years Kan-do, Inc. hired Mr. Brown's company to complete the following tasks to maintain and care for the KAN-DO:

1. 2/16/10: Fixed generator by repairing wire harness with retesting. (Doc. 36, page 8 – 9).
2. 6/11/10: Checked all three bilge pumps. Found one dead battery, so cleaned and pumped the bilge, checked the pumps and wiring, and installed and tested one battery. Test ran both engines and the generator, and replaced one red indicator on the dash panel. (Doc. 36, page 9).
3. 1/25/11: Checked bilge pumps and batteries, replaced the midship auto float switch for the bilge pump, checked and fixed water leak on the port engine behind the carburetor, trouble-shooted the generator, fixed wiring, heat-shrink checks, and replaced starboard transmission. (Doc. 36, page 12).
4. 8/1/11: Replaced starter solenoid in generator, checked water and oil, and replaced water pump assembly (rear AC pump). (Doc. 36, page 14).
5. Checked starboard battery, and replaced a set of spark plugs in port engine. (Doc. 36, page 15). (date unclear)
6. 12/22/11: Checked bilge pump and batteries, replaced aft port battery, filled and recharged forward battery, and repaired air conditioning duct. (Doc. 36, page 15).

7. 9/26/12: Checked generator set, replaced faulty impeller in generator and tested. (Doc. 36, page 16).

8. 10/23/12: Replaced hydraulic cylinder and tested. (Doc. 36, page 16 – 17).

The Brown Marine bills for the last three years totaled $10,391.17. (Doc. 36, see exhibits).

The record of maintenance for the past three years, and the testimony describing the time, resources, and meticulous care Frank Kunnen, Guy Kunnen, and Laura Lyons took to maintain the KAN-DO prove that at the time it sank, the KAN-DO was in a condition of reasonable fitness for its intended use. This record evidence, when viewed in the light most favorable to the non-movant (Kan-Do, Inc.), requires that there be a trial on the issue of whether the boat was seaworthy.

### VI. - THE GREAT LAKES POLICY HAS INCONSISTENT LANGUAGE WHICH SHOULD BE CONSTRUED AGAINST THE DRAFTER OF THE POLICY

Counsel for Great Lakes has suggested that there is no coverage for loss of the engines, mechanical or electrical parts, unless caused by an accidental external event. Kan-Do, Inc. submits that this language is inconsistent with the other language in Great Lakes' own "all risk" policy with coverage for accident physical loss of or damage to a scheduled vessel, which occurs during the period of this insuring agreement. Great Lakes drafted the insurance contract. The clauses are inconsistent with each other. Under prevailing insurance law, any ambiguity should be held against the drafter, namely Great Lakes. On that basis this portion of Great Lakes' motion should be denied. Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co., 254 F. 3d 987, 1003 (11th Cir. 2001) citing Gulf

19

Tampa Drydocks Co., 757 F 2d at 1174 (11th Cir. 1988); see also Gas Kwick v. United Pac. Ins. Co., 58 F. 3d 1536, 1539 (11th Cir. 1995).

## VII. - CONCLUSION

Kan-Do, Inc. respectfully submits that there are disputed factual issues on 1) whether there was an accident or fortuity and 2) whether the KAN-DO was seaworthy. The record demonstrates factual disputes exist on both issues. However, since counsel for Great Lakes has stated that he stipulates as to the blown fuse (see Doc. 28, pages 6 and 7) the undersigned would suggest that the Court should enter a partial summary judgment in Kan-Do, Inc.'s favor on whether there was an accident or fortuitous loss. The only issue remaining for trial would then be whether the KAN-DO was seaworthy.

Respectfully submitted,

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on **March 14, 2014**, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to: **Steven E. Goldman**, Esquire, Goldman & Hellman, 800 SE 3rd Avenue, 4th Floor, Fort Lauderdale, FL 33316.

/s/ Jacob J. Munch
JACOB J. MUNCH, ESQUIRE
MUNCH and MUNCH, P.A.
600 South Magnolia Avenue, Suite 325
Tampa, Florida 33606
Telephone: (813) 254-1557
Facsimile: (813) 254-5172
Email: sealaw@tampabay.rr.com
Florida Bar Number 376523
Attorney for DefendantKAN-DO, Inc.