UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
IN ADMIRALTY

GREAT LAKES REINSURANCE
(UK) PLC,

      Plaintiff,

                                CASE NO. 12-CV-2923-VMC-TGW

vs.

KAN-DO MARINE RESEARCH
& PRODUCTS, INC.,

      Defendant.

_____/

## AMENDED JOINT FINAL PRE-TRIAL STATEMENT

COMES NOW the parties hereto, the Plaintiff GREAT LAKES REINSURANCE (UK) PLC, ("Great Lakes") and the Defendant KAN-DO MARINE RESEARCH & PRODUCTS, INC. ("Kan-Do, Inc."), by and through their undersigned attorneys, and pursuant to Rule 3.06(c) of the Local Rules of the United States District Court for the Middle District of Florida, files this their Joint Final Pre-Trial Statement, and further thereto would respectfully state as follows:

## I.
## BASIS FOR FEDERAL JURISDICTION

Federal jurisdiction over this case is based on 28 U.S.C. §1333, admiralty jurisdiction.

## II.
## NATURE OF THE ACTION

The instant action is one in which the Plaintiff has commenced a declaratory judgment action, invoking this Court's admiralty jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure, asking this Court to rule that a policy of marine insurance issued by Plaintiff to

Defendant does not afford coverage for the constructive total loss of the insured vessel as a result of that vessel sinking at its mooring in a marina which occurred on or about November 5, 2012.

Plaintiff's Complaint asserts four (4) separate causes of action, with Plaintiff asserting as follows:

(A)     The incident in which the insured vessel sank at its mooring does not constitute an accidental loss for which the policy would afford coverage;

(B)     The vessel was in unseaworthy condition prior to and at the time of the incident in which it sank at its mooring, in breach of a warranty in the policy;

(C)     The insured vessel sank at its mooring because of wear and tear, gradual deterioration, etc. and was therefore subject to an exclusion in the policy;

(D)     If there was coverage for some of the damage, any and all damage to the insured vessel's engines, mechanical and electrical parts was subject to an exclusion in the policy.

## III.
## GENERAL STATEMENT OF EACH PARTY'S CASE

Plaintiff:     As stated, *supra*, the vessel quite simply sank at its mooring in a quiet marina, in calm waters and clear weather. The post-incident investigation carried out by a local marine surveyor concluded that water flooded the vessel because packing at the port-side shaft gland simply wore out, and for reasons which remain uncertain, the vessel's bilge pumps failed to operate.

Defendant:     Defendant, Kan Do, Inc. is making an insurance claim against the Plaintiff, Great Lakes pursuant to an "all risks" insurance policy.  On November 5, 2012, the insured boat KAN DO sunk after being placed back into the water after being hauled for an insurance survey and repairs.

2

Standard procedure for checking for leaks was used by the boat yard when the KAN DO was put back into the water after the dry docking.  There were no leaks detected.  The boat yard had hooked up shore power when the KAN DO was put back in her assigned slip.   Shortly after being placed back in the water the KAN DO took on water and the main bilge pump failed to pump the water out of the boat.  The main bilge pump should have been able to keep up with the amount of water coming into the boat.  After the sinking, the boat was raised and then inspected.  An inspection of the main bilge pump showed that it had a blown fuse which caused it not to operate.  The evidence will show that the KAN DO was well maintained by Browns Marine Repair who had done repairs and maintenance on the boat for over fifteen years.  The blown bilge pump fuse was one of the risks covered by the "all risks" insurance policy.  Kan-Do, Inc. is entitled to payment for the total loss of the vessel, its contents (personal effects), less its deductible, the costs of the Sea Tow salvage bill, plus interest and costs.

## IV.
## EXHIBITS LISTS

Plaintiff: 1. Great Lakes Reinsurance (UK) plc Policy No. OSPYP/134083.

   2. Plaintiff's Underwriting File for Policy No. OSPYP/134083.

    a. Defendant's objection – hearsay.

   3. Survey Report of Southern Yacht Surveyors, dated 12 November 2012 with attached photographs.

    a. Defendant's objection – hearsay.

   4. Photographs from Christopher Mills' inspection.

   5. Preliminary Report of Wager & Associates, dated November 12, 2012.

    a. Defendant's objection – hearsay.

3

6.    Surveyors File Loss Report (undated).

    a.    Defendant's objection – hearsay.

7.    Denial Letter from Osprey Special Risks Limited to Defendant, dated December 21, 2012.

Defendant:    1.    Insurance policy.

2.    Photos of boat taken on November 5, 2012 after sinking (25) (composite exhibit).

3.    2010 repair invoices and bottom cleaning invoices.

4.    2011 repair invoices and bottom cleaning invoices.

5.    2012 repair invoices and bottom cleaning invoices.

6.    Salvage Bill from Sea Tow.

7.    Photographs from Dan Avoures' inspection.

## V.
## WITNESS LISTS

Plaintiff:    1.    B.A. Usher
Sr. Dir. & Underwriter
Concept Special Risks Ltd.
Unity House
2 Station Court
Station Road
Guiseley, West Yorkshire LS20 8EY
United Kingdom

2.    Alexander Mark Thomas
Dir. & Marine Claims Mgr.
Concept Special Risks Ltd.
Unity House

        2 Station Court
        Station Road
        Guiseley, West Yorkshire LS20 8EY
        United Kingdom

3.       Doug Wager
        Wager & Associates
        7231 Lafitte Reef
        Pensacola, FL 32507

4.       Christopher Mills, AMS
        118 N. Clair Drive
        Panama City, FL 32401

5.       Frank S. Kunnen
        c/o Munch & Munch, P.A.
        600 S. Magnolia AvenueSuite 325
        Tampa, FL 33606

6.       Guy P. Kunnen
        c/o Munch & Munch, P.A.
        600 S. Magnolia AvenueSuite 325
        Tampa, FL 33606

7.       Laura Lyons
        c/o Munch & Munch, P.A.
        600 S. Magnolia AvenueSuite 325
        Tampa, FL 33606

8.       Vickie S. Glorioso
        VP, Commercial Lines
        Alley, Rehbaum & Capes Assurance, Inc.

9.       Anne Meier
        Hull & Company, Inc./Tampa Bay
        800 Carillon Parkway #150
        St. Petersburg, FL 33716

10.      James Carlevatti
        c/o Port Tarpon Marina
        527 Anclote Road #200
        Tarpon Springs, FL 34689

11.      Robert Koan

                       c/o Port tarpon Marina
                       527 Anclote Road #200
                       Tarpon Springs, FL 34689

Defendant:   1.     Laura Lyons
                       President of Kan Do, Inc.
                       2222 Edythe Drive
                       Dunedin, FL

           2.     Guy Kunnen
                       22607 U.S. 19 North
                       Cleaarwater, FL 33765

           3.     James Carlavatti
                       8708 Woodlawn Court
                       New Port Richey, FL 34668

           4.     William Schiffner
                       2260 Richter Street
                       Dunedin, FL 34698

           5.     Joey Kaminski
                       3729 Haven Drive
                       New Port Richey, FL 34652

           6.     Wayne Brown
                       527 Anclote Road
                       Tarpon Springs 34689

           7.     Daniel Avoures
                       P.O. Box 1852
                       Tracy City, TN 37387

## VI.
## EXPERT WITNESSES

Plaintiff:   Christopher Mills, AMS
               118 N. Clair Drive
               Panama City, FL 32401

               Mr. Mills is a marine surveyor

Defendant:     Daniel Avoures
                P.O. Box 1852
                Tracy City, TN 37387

                Mr. Avoures is a marine surveyor and naval architect.

## VII.
## DAMAGES

Defendant:    1.    The amount under the hull policy of $ 77,622.00 less $ 3,105.00 deductible = $ 74,517.00,

            2.    personal property under the policy of $ 10,000.00 less $ 1,000.00 deductible = $ 9,000.00, and

            3.    salvage bill for $ 10,400.00 from Sea Tow and salvage expenses from Port Tarpon Marina for $ 472.85.

## VIII.
## DEPOSITIONS

Defendant:    1.    B.A. Usher (c/o the plaintiff)

## IX.
## AMENDED STIPULATED FACTS

1.    The Plaintiff in the instant action is a UK-based marine insurance company which issued a policy affording Hull & Machinery coverage on a vessel (the Kan-Do) which for insurance purposes was described as a 51-foot Bluewater Motor Yacht, powered by twin 270 hp Crusader gasoline engines, that was built in 1989.

7

2.      The Kan-Do's hull was insured by Defendant, Great Lakes, under an all risk policy for $77,622.00.

3.      The instant action is one in which the Plaintiff has commenced a declaratory judgment action, invoking the Court's admiralty jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure, asking the Court to rule that the policy of marine insurance affords no coverage for an incident which is alleged to have occurred on or about November 5, 2012.  It was as a result of this incident that the Defendant filed a claim with the Plaintiff contending that the insured vessel was a constructive total loss and demanding payment of an amount equal to the full insured value of the vessel, plus a claim for personal effects and sue and labor expenses.

4.      The Defendant, Kan-Do, Inc. is an active Florida corporation.  It was incorporated in 1992.

5.      At the time of the November 5, 2012 incident, as well as any other times relevant hereto, the insured vessel (the Kan-Do) was kept at the Port Tarpon Marina located in Tarpon Springs, Florida, at the C-7 slip.  The vessel was located at its "home slip" on the date of the incident.

6.      The Defendant paid Port Tarpon marine a monthly rental for the slip of $428.00.  Defendant also paid a monthly utility bill for the electric power utilized by the vessel while it was secured at its slip.

7.      Before coverage was first underwritten in 2009, the Kan-Do was surveyed by marine surveyor William Schiffner, who issued a "pre-insurance survey" for the benefit of the insurance

8

underwriters in order to inspect the vessel for possible deficiencies that would "affect the risk as it is presented to the underwriters."

8.      When Mr. Schiffner surveyed the vessel in 2009 he said it looked like it was being maintained.

9.      At the time Great Lakes issued coverage for the Kan-Do (2009), Mr. Schiffner's pre-insurance survey (inspection) did not reveal any deficiencies of the vessel that would have caused Great Lakes to deny coverage.

10.     On October 23, 2012 the vessel was pulled out of the water for an updated insurance inspection by Mr. Schiffner and for bottom painting.  Mr. Schiffner completed the "out of the water" portion of the survey and found no deficiencies.

11.     The vessel was not leaking when it was pulled and set on the blocks to be inspected and repainted.

12.     When the boat was lowered back into the water on Friday, November 2, 2012, and still in the travel slings, various hatches were opened to inspect if any water was entering the Kan-Do, including the lazarette in the back of the boat, both engine hatch covers, and the forward bilge area.  At that time, no water was entering the vessel, no water was leaking by the rudders or shaft logs, and there was no standing or running water in or about the vessel.

13.     After the inspection and paint job on October 23, 2012, and the Kan-Do was lowered back into the water, the vessel was pulled back into its slip, tied up, and hooked back up to shore power.  At this time power to all three bilge pumps (forward, mid, and rear) was also found to be in good working order.  All instruments were powered back on and nothing tripped a breaker, nothing popped off, and the indicator showed that power was on to the panel.  The AC power (alternating

current) came onto the panel, which showed that the battery charger came on. The three switches for the bilge automatic system were also in the on position.

14.     The last person to leave the vessel after it was placed back into the water at its dock space on October 23, 2012, was Captain Joey Kaminski, the captain of a stone crab boat and a sport fishing boat, who docks one of his boats three slips down from where the Kan-Do was docked. Captain Kaminski stated that when he left the vessel the three bilge pumps were on automatic and no water was being pumped out of the bilge, and that the back of the boat, the lowest part of the bilge, was dry with no water running inside it.

15.     On November 5, 2012, somebody from the Tarpon Springs Marine telephoned the office of Defendant's president, Ms. Laura Lyons, and advised that the vessel was sinking at its slip.

16.     On November 5, 2012, the Kan-Do sank at Port of Tarpon Marina, in Tarpon Springs, Florida, in calm waters.

17.     Kan-Do, Inc. sought insurance benefits from Great Lakes pursuant to its all risk policy.

18.     The loss occurred within the policy period of November 18, 2011 to November 18, 2012.

19.     Following receipt of notice of the incident and the formal submission of the Defendant's claim, Plaintiff appointed the marine surveying and adjusting form of Wager & Associates in order to oversee the investigation into the facts and circumstances surrounding the Kan-Do's Novermber 5, 2012 sinking at its slip.

20.     On November 6, 2012, following appointment by Plaintiff, Wager & Associates sent a letter to the Defendant apprising the Defendant of the assignment and requesting assistance and cooperation.

21.     The losses claimed by Kan-Do, Inc. are:

    a.      totally constructive loss of the vessel Kan-Do, which is $77,622.00,

    b.      salvage expenses claimed by Sea Tow for $10,400.00 and Port Tarpon Marina for $472.85, and

    c.      personal property aboard the boat, which exceeded the $10,000.00 limit of the policy.

22.     Plaintiff appointed marine surveyor Chris Mills in order to survey the damage to the vessel.

23.     Defendant also engaged a marine surveyor, Daniel J. Avoures & Associates, Inc., in order to inspect the vessel and arrive at a cause for the sinking at the pier.

24.     In a letter dated December 21, 2012, Plaintiff Great Lakes communicated denial of coverage for Defendant's claim, setting forth reasons therefore and advising further of Plaintiff's having availed itself of the opportunity to seek the Court's declaratory judgment on the coverage issues.

25.     Coverage was denied based on the following provision of the policy:

Coverage A, Hull, Machinery, Equipment and Dingy

[W]e provide coverage for accidental physical loss of, or accidental physical damage to the Scheduled Vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declarations page, subject to the insuring agreement provisions, conditions, warranties, deductible and exclusions.

26.     Under the definitions page of the policy, there is no definition of "accidental physical loss."

27.     Coverage was also denied based on the following exclusion in the policy:

Exclusions to Coverage A

Unless specifically agreed by us in writing and additional premium charged the following losses and/or damages whether incurred directly or indirectly are not covered by this insuring agreement:

****** 

r)      Damage to the Scheduled Vessel's engines, mechanical and electrical parts, unless caused by an accidental external event such as collision, impact with a fixed or floating object, grounding, stranding, ingestion of foreign object, lightning strike or fire.

28.     The Kan-Do sank due to water intrusion when the bilge pump system failed.

29.     The bilge pump system failed as a result of a blown fuse.

30.     No one knows what caused the fuse to blow.

31.     Daniel Avoures, hired by Defendant, prepared a detailed report regarding the cause of the sinking, stating "an incursion of water from the port shaft stuffing box allow[ed] water to accumulate in the bilges.  The failure of the main bilge pump to dewater the vessel because of a blown fuse allowed water to accumulate to the point that a bilge discharge through hull fitting submerged and allowed rapid incursion of water."  In other words, the blown fuse rendered the bilge pump inoperable, despite being connected to shore power.

32.     The Kan-Do had three Rule 2000 gallon per hour pumps which total 6000 gallon per hour.  The bilge pump in the stern was rated 3700 gallons per hour.  The vessel should have been able to pump out the water coming in.

33.     After it sank, Mr. Avoures tested the aft bilge pump and noted that it was working.

34.     Also, after the boat sank, was refloated, and was pulled out of the water, Captain Kaminski observed that neither of the nuts on either side of the stuffing boxes (packing glands) had backed off or loosened up.  He did not see any exorbitant amount of water coming out of the stuffing boxes that would justify the boat sinking.

35.     Captain Kaminski had installed roughly 60 of the stuffing boxes (packing glands like the ones aboard the Kan-Do) in his experience with boats.  Captain Kaminski stated that these stuffing boxes are typically not dripless.  They are designed to drip for purposes of cooling and lubrication.  The system on the boats is considered a management system because it is certain that water is going to be coming in the boat in a small, minute amount; the owner then needs to manage the water coming in.

36.     Christopher Mills, hired by Great Lakes to inspect the Kan-Do after it sank, never opened up the packing gland on the port engine to see how much packing was there.

37.     For the year before the Kano-Do sank, Guy Kunnen, the brother of Laura Lyons (president of Kan-Do, Inc.), had primary responsibility of overseeing the maintenance of the Kan-Do.  As part of this responsibility, on a weekly basis Mr. Kunnen checked on the Kan-Do by making sure that the shore power was plugged in so that the batteries which ran the vessel's three bilge pumps would always maintain their charge; started the generators, motors, and air conditioner; inspected the bilge compartments to make sure the bilge was dry; and tested the bilge pumps to make sure that they were working.

38.     The last time Mr. Kunnen checked on the Kan-Do was October 22, 2012, just before the vessel was pulled out of water for the insurance survey.  On this date, he checked the shore

power, generators, motors, air conditioner, bilge compartments, and bilge pumps.  Mr. Kunnen stated that the bilge pumps were working that day.

39.   Wayne Brown of Brown's Marine Service was hired by Kan-Do, Inc. maintain the Kan-Do for fifteen years before the vessel sank.

40.   Mr. Brown provided various services to keep the Kan-Do in good working order. Guy Kunnen stated that when the vessel needed repairs Mr. Brown was called, and "[i]f there was something that the Kan-Do needed, it was always taken care of.  Nothing was ever put off or not replaced."

41.   In the last three years prior to the Kan-Do sinking, Kan-Do, Inc. hired Mr. Brown's company to complete the following tasks to maintain and care for the Kan-Do:

a.   2/16/10:  Fixed generator by repairing wire harness with retesting.

b.   6/11/10:  Checked all three bilge pumps.  Found one dead battery, so cleaned and pumped the bilge, checked the pumps and wiring, and installed and tested one battery.  Test ran both engines and the generator, and replaced on red indicator on the dash panel.

c.   1/25/11:  Checked bilge pumps and batteries, replaced the midship auto float switch for the bilge pump, checked and fixed water leak on the port engine behind the carburetor, trouble-shooted the generator, fixed wiring, heat-shrink checks, and replaced starboard transmission.

d.   8/1/11:  Replaced starter solenoid in generator, checked water and oil, and replaced water pump assembly (rear AC pump).

14

    e.    12/22/11:  Checked bilge pump and batteries, replaced aft port battery, filled and recharged forward battery, and repaired air conditioning duct.

    f.    Checked generator set, replaced and tested faulty impeller in generator.

    g.    10/23/12:  Replaced and tested hydraulic cylinder.

42.    The Brown Marine bills for the last three years before the Kan-Do sank totaled $10,391.17.

43.    Captain Kaminski stated that Frank Kunnen, father of Laura Lyons (president of Kan-Do, Inc.) was always at the port taking care of the vessel, starting it up and running it, that he came down almost every weekend, and that the Kan-Do owners were adamant about starting up the boat to be sure it was working properly.

44.    Dan Avoures states that the owners of the Kan-Do used due diligence to maintain the vessel in a seaworthy condition at all material times.

45.    Marine mechanic Wayne Brown also states that in his opinion the Kan-Do was properly maintained.

46.    The vessel was never repaired, but was instead sold by the Defendant for $7,500.00 in salvage value.  Defendant gave the $7,500.00 to Port Tarpon Marina to satisfy the dockage bill that accrued after the sinking.

47.    The damages sustained by Defendant, Kan-Do, Inc., as a result of the sinking are:

    a.    The amount under the hull policy of $ 77,622.00 less $ 3,105.00 deductible = $ 74,517.00,

    b.    personal property under the policy of $ 10,000.00 less $ 1,000.00 deductible = $ 9,000.00, and

c.      salvage bill for $ 10,400.00 from Sea Tow and salvage expenses from Port

Tarpon Marina for $ 472.85.

## X.
## CONCISE STATEMENT ON APPLICABLE PRINCIPLES OF LAW ON WHICH THERE IS AGREEMENT

1.      The parties agree that the general maritime law of the United States governs the

case.

## XI.
## A CONCISE STATEMENT OF FACTS WHICH REMAIN TO BE LITIGATED

1.      None.

## XII.
## CONCISE STATEMENT OF ISSUES OF LAW WHICH REMAIN FOR THE COURT

1.      Whether the loss was fortuitous under the "all risks" policy.

2.      Whether the vessel was in unseaworthy condition at the time of the sinking.

3.      Whether the alleged damage was subject to the exclusion in Plaintiff's policy for

wear and tear, gradual deterioration, etc.

4.      Whether the portion of the total claim attributable to damage to the vessel's

engines, mechanical and electrical parts, etc., is subject to the policy exclusion restricting coverage

to an accidental external event, etc.

16

Case 8:12-cv-02923-VMC-TGW   Document 78   Filed 04/16/15   Page 17 of 18 PageID 634

## XIII.
## ANY DISAGREEMENT OF THE APPLICABILITY OF THE FRE AND FRCP

1.      None.


## XIV.
## LIST OF MOTIONS THAT REQUIRE ACTION OF THE COURT

1.      None.


Dated: April 15, 2015


GOLDMAN & HELLMAN                    MUNCH & MUNCH, P.A.
Attorneys for Plaintiff             Attorneys for Defendant
800 S.E. 3rd Avenue            600 S. Magnolia Avenue
4th Floor                      Suite 325
Fort Lauderdale, FL 33316           Tampa, FL 33606
Tel (954) 356-0460                  Tel (813) 254-1557
Fax (954) 832-0878                  Fax (813) 254-5172


By:    /s/ Steven E. Goldman         By:    /s/ Jacob J. Munch
       STEVEN E. GOLDMAN, ESQ.              JACOB J. MUNCH, ESQ.
       FLA. BAR NO. 345210                  FLA. BAR NO. 376523