UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
IN ADMIRALTY

GREAT LAKES REINSURANCE
(UK) PLC,

    Plaintiff,

CASE NO. 8:12-cv-2923-T-33TGW

vs.

KAN-DO MARINE RESEARCH
& PRODUCTS, INC.,

    Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case has come before the Court upon stipulated facts. The Court adopts the stipulated facts from the Amended Joint Pre-Trial Statement (Doc. 78) as follows:

### FINDINGS OF FACT:

1.    The Plaintiff in the instant action is a UK-based marine insurance company which issued a policy affording Hull & Machinery coverage on a vessel (the Kan-Do) which for insurance purposes was described as a 51-foot Bluewater Motor Yacht, powered by twin 270 hp Crusader gasoline engines, that was built in 1989.

2.    The Kan-Do's hull was insured by Defendant, Great Lakes, under an all risk policy for $77,622.00.

3.    The instant action is one in which the Plaintiff has commenced a declaratory judgment action, invoking the Court's admiralty jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure, asking the Court to rule that the policy of marine insurance affords no coverage for an incident which is alleged to have occurred on or about

November 5, 2012. It was as a result of this incident that the Defendant filed a claim with the Plaintiff contending that the insured vessel was a constructive total loss and demanding payment of an amount equal to the full insured value of the vessel, plus a claim for personal effects and sue and labor expenses.

4. The Defendant, Kan-Do Marine Research & Products, Inc. ("Kan-Do, Inc.") is an active Florida corporation. It was incorporated in 1992.

5. At the time of the November 5, 2012 incident, as well as any other times relevant hereto, the insured vessel (the Kan-Do) was kept at the Port Tarpon Marina located in Tarpon Springs, Florida, at the C-7 slip. The vessel was located at its "home slip" on the date of the incident.

6. The Defendant paid Port Tarpon marine a monthly rental for the slip of $428.00. Defendant also paid a monthly utility bill for the electric power utilized by the vessel while it was secured at its slip.

7. Before coverage was first underwritten in 2009, the Kan-Do was surveyed by marine surveyor William Schiffner, who issued a "pre-insurance survey" for the benefit of the insurance underwriters in order to inspect the vessel for possible deficiencies that would "affect the risk as it is presented to the underwriters."

8. When Mr. Schiffner surveyed the vessel in 2009 he said it looked like it was being maintained.

9. At the time Great Lakes issued coverage for the Kan-Do (2009), Mr. Schiffner's pre-insurance survey (inspection) did not reveal any deficiencies of the vessel that would have caused Great Lakes to deny coverage.

10. On October 23, 2012 the vessel was pulled out of the water for an updated insurance inspection by Mr. Schiffner and for bottom painting. Mr. Schiffner completed the "out of the water" portion of the survey and found no deficiencies.

11. The vessel was not leaking when it was pulled and set on the blocks to be inspected and repainted.

12. When the boat was lowered back into the water on Friday, November 2, 2012, and still in the travel slings, various hatches were opened to inspect if any water was entering the Kan-Do, including the lazarette in the back of the boat, both engine hatch covers, and the forward bilge area. At that time, no water was entering the vessel, no water was leaking by the rudders or shaft logs, and there was no standing or running water in or about the vessel.

13. After the inspection and paint job on October 23, 2012, and the Kan-Do was lowered back into the water, the vessel was pulled back into its slip, tied up, and hooked back up to shore power. At this time power to all three bilge pumps (forward, mid, and rear) was also found to be in good working order. All instruments were powered back on and nothing tripped a breaker, nothing popped off, and the indicator showed that power was on to the panel. The AC power (alternating current) came onto the panel, which showed that the battery charger came on. The three switches for the bilge automatic system were also in the on position.

14. The last person to leave the vessel after it was placed back into the water at its dock space on October 23, 2012, was Captain Joey Kaminski, the captain of a stone crab boat and a sport fishing boat, who docks one of his boats three slips down from where the Kan-Do was docked. Captain Kaminski stated that when he left the vessel the three bilge

pumps were on automatic and no water was being pumped out of the bilge, and that the back of the boat, the lowest part of the bilge, was dry with no water running inside it.

15. On November 5, 2012, somebody from the Tarpon Springs Marine telephoned the office of Defendant's president, Ms. Laura Lyons, and advised that the vessel was sinking at its slip.

16. On November 5, 2012, the Kan-Do sank at Port of Tarpon Marina, in Tarpon Springs, Florida, in calm waters.

17. Kan-Do, Inc. sought insurance benefits from Great Lakes pursuant to its all risk policy.

18. The loss occurred within the policy period of November 18, 2011 to November 18, 2012.

19. Following receipt of notice of the incident and the formal submission of the Defendant's claim, Plaintiff appointed the marine surveying and adjusting form of Wager & Associates in order to oversee the investigation into the facts and circumstances surrounding the Kan-Do's Novermber 5, 2012 sinking at its slip.

20. On November 6, 2012, following appointment by Plaintiff, Waer & Associates sent a letter to the Defendant apprising the Defendant of the assignment and requesting assistance and cooperation.

21. The losses claimed by Kan-Do, Inc. are:
   a. totally constructive loss of the vessel Kan-Do, which is $77,622.00,
   b. salvage expenses claimed by Sea Tow for $10,400.00 and Port Tarpon Marina for $472.85, and

  c. personal property aboard the boat, which exceeded the $10,000.00 limit of the policy.

22. Plaintiff appointed marine surveyor Chris Mills in order to survey the damage to the vessel.

23. Defendant also engaged a marine surveyor, Daniel J. Avoures & Associates, Inc., in order to inspect the vessel and arrive at a cause for the sinking at the pier.

24. In a letter dated December 21, 2012, Plaintiff Great Lakes communicated denial of coverage for Defendant's claim, setting forth reasons therefore and advising further of Plaintiff's having availed itself of the opportunity to seek the Court's declaratory judgment on the coverage issues.

25. Coverage was denied based on the following provision of the policy:

> Coverage A, Hull, Machinery, Equipment and Dingy
>
> [W]e provide coverage for accidental physical loss of, or accidental physical damage to the Scheduled Vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declarations page, subject to the insuring agreement provisions, conditions, warranties, deductible and exclusions.

26. Under the definitions page of the policy, there is no definition of "accidental physical loss."

27. Coverage was also denied based on the following exclusion in the policy:

> Exclusions to Coverage A
>
> Unless specifically agreed by us in writing and additional premium charged the following losses and/or damages whether incurred directly or indirectly are not covered by this insuring agreement:
>
> ******

5

        r)    Damage to the Scheduled Vessel's engines, mechanical and electrical parts, unless caused by an accidental external event such as collision, impact with a fixed or floating object, grounding, stranding, ingestion of foreign object, lightning strike or fire.

28. The Kan-Do sank due to water intrusion when the bilge pump system failed.

29. The bilge pump system failed as a result of a blown fuse.

30. No one knows what caused the fuse to blow.

31. Daniel Avoures, hired by Defendant, prepared a detailed report regarding the cause of the sinking, stating "an incursion of water from the port shaft stuffing box allow[ed] water to accumulate in the bilges. The failure of the main bilge pump to dewater the vessel because of a blown fuse allowed water to accumulate to the point that a bilge discharge through hull fitting submerged and allowed rapid incursion of water." In other words, the blown fuse rendered the bilge pump inoperable, despite being connected to shore power.

32. The Kan-Do had three Rule 2000 gallon per hour pumps which total 6000 gallon per hour. The bilge pump in the stern was rated 3700 gallons per hour. The vessel should have been able to pump out the water coming in.

33. After it sank, Mr. Avoures tested the aft bilge pump and noted that it was working.

34. Also, after the boat sank, was refloated, and was pulled out of the water, Captain Kaminski observed that neither of the nuts on either side of the stuffing boxes (packing glands) had backed off or loosened up. He did not see any exorbitant amount of water coming out of the stuffing boxes that would justify the boat sinking.

35. Captain Kaminski had installed roughly 60 of the stuffing boxes (packing glands like the ones aboard the Kan-Do) in his experience with boats. Captain Kaminski stated that these stuffing boxes are typically not dripless. They are designed to drip for purposes of cooling and lubrication. The system on the boats is considered a management system because it is certain that water is going to be coming in the boat in a small, minute amount; the owner then needs to manage the water coming in.

36. Christopher Mills, hired by Great Lakes to inspect the Kan-Do after it sank, never opened up the packing gland on the port engine to see how much packing was there.

37. For the year before the Kano-Do sank, Guy Kunnen, the brother of Laura Lyons (president of Kan-Do, Inc.), had primary responsibility of overseeing the maintenance of the Kan-Do. As part of this responsibility, on a weekly basis Mr. Kunnen checked on the Kan-Do by making sure that the shore power was plugged in so that the batteries which ran the vessel's three bilge pumps would always maintain their charge; started the generators, motors, and air conditioner; inspected the bilge compartments to make sure the bilge was dry; and tested the bilge pumps to make sure that they were working.

38. The last time Mr. Kunnen checked on the Kan-Do was October 22, 2012, just before the vessel was pulled out of water for the insurance survey. On this date, he checked the shore power, generators, motors, air conditioner, bilge compartments, and bilge pumps. Mr. Kunnen stated that the bilge pumps were working that day.

39. Wayne Brown of Brown's Marine Service was hired by Kan-Do, Inc. maintain the Kan-Do for fifteen years before the vessel sank.

40. Mr. Brown provided various services to keep the Kan-Do in good working order. Guy Kunnen stated that when the vessel needed repairs Mr. Brown was called, and "[i]f there was something that the Kan-Do needed, it was always taken care of. Nothing was ever put off or not replaced."

41. In the last three years prior to the Kan-Do sinking, Kan-Do, Inc. hired Mr. Brown's company to complete the following tasks to maintain and care for the Kan-Do:

   a. 2/16/10: Fixed generator by repairing wire harness with retesting.

   b. 6/11/10: Checked all three bilge pumps. Found one dead battery, so cleaned and pumped the bilge, checked the pumps and wiring, and installed and tested one battery. Test ran both engines and the generator, and replaced on red indicator on the dash panel.

   c. 1/25/11: Checked bilge pumps and batteries, replaced the midship auto float switch for the bilge pump, checked and fixed water leak on the port engine behind the carburetor, trouble-shooted the generator, fixed wiring, heat-shrink checks, and replaced starboard transmission.

   d. 8/1/11: Replaced starter solenoid in generator, checked water and oil, and replaced water pump assembly (rear AC pump).

   e. 12/22/11: Checked bilge pump and batteries, replaced aft port battery, filled and recharged forward battery, and repaired air conditioning duct.

   f. Checked generator set, replaced and tested faulty impeller in generator.

   g. 10/23/12: Replaced and tested hydraulic cylinder.

42. The Brown Marine bills for the last three years before the Kan-Do sank totaled $10,391.17.

43. Captain Kaminski stated that Frank Kunnen, father of Laura Lyons (president of Kan-Do, Inc.) was always at the port taking care of the vessel, starting it up and running it, that he came down almost every weekend, and that the Kan-Do owners were adamant about starting up the boat to be sure it was working properly.

44. Dan Avoures states that the owners of the Kan-Do used due diligence to maintain the vessel in a seaworthy condition at all material times.

45. Marine mechanic Wayne Brown also states that in his opinion the Kan-Do was properly maintained.

46. The vessel was never repaired, but was instead sold by the Defendant for $7,500.00 in salvage value. Defendant gave the $7,500.00 to Port Tarpon Marina to satisfy the dockage bill that accrued after the sinking.

47. The damages sustained by Defendant, Kan-Do, Inc., as a result of the sinking are:

    a. The amount under the hull policy of $77,622.00 less $3,105.00 deductible = $74,517.00,

    b. personal property under the policy of $10,000.00 less $1,000.00 deductible = $9,000.00, and

    c. salvage bill for $10,400.00 from Sea Tow, and salvage expenses for Port Tarpon Marina for $472.85.

## **CONCLUSIONS OF LAW**

1. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1333, admiralty and maritime jurisdiction.

2. This case was filed as a declaratory judgment action and the parties stipulated at the pretrial conference that the only issues for the Court's determination were: 1) whether the loss was caused by a fortuitous event, and 2) whether policy exclusion "r" excludes coverage for the vessels "engines, mechanical and electrical parts" unless those parts are damaged by "an accidental external event such as a collision, impact with a fixed or floating object, grounding, stranding, injection or foreign object, lightening strike or fire."

3. The Plaintiff has withdrawn claims that the Kan-Do was unseaworthy and that the "wear and tear, gradual deterioration" exclusion would apply to this case (exclusion "b" to coverage "A" under the policy).

4. The insurance policy is an all risk insurance policy.

5. "An all risk policy is one which provides coverage against all risks covering every loss that may happen except by the fraudulent acts of the insured." Lamadrid v. Nat'l Union Fire Ins. Co., No. 13-11416, 2014 U.S. App. LEXIS 9548, at *14 (11th Cir. May 22, 2014) (internal citations omitted). An all risk insurance policy "creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." Id. at *14-15.

6. To recover under an all risk marine insurance policy, the insured must first show that the loss occurred during the coverage period and that the contract encompasses the loss. Banco Nacional de Nicaragua v. Argonaut Ins. Co., 681 F.2d 1337, 1340 (11th Cir. 1982); Morrison Grain Co. v. Utica Mutual Ins. Co., 446 F. Supp. 414, 429 (M.D. Fla.

1977). The policy states that Great Lakes will provide coverage for "accidental physical loss of, or accidental physical damage to the Scheduled Vessel." (Doc. # 1-1 at 10). Although the Policy contains a plethora of defined terms, it does not define "accident" or "accidental."

7. The Eleventh Circuit has explained that marine all risk insurance contracts that refer to an accident or accidental losses are governed by the fortuity doctrine. See Lamadrid, 2014 U.S. App. LEXIS 9548 at *17 (a "fortuitous event" is defined as: "an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties.") (internal citations omitted).

8. However, as stated in International Ship Repair & Marine Services v. St. Paul Fire & Marine Insurance Company, 944 F. Supp. 886, 892 (M.D. Fla. 1996):

> [A] loss is not considered fortuitous if it results from an inherent defect in the object damaged, from ordinary wear and tear, or from the intentional misconduct of the insured . . . [F]ortuitous events are accidents or casualties of the seas, unforeseen and unexpected events, and are not losses occasioned by the incursion of water into a vessel's hull owing to the defective, deteriorated or decayed condition of the hull or ordinary wear and tear.

Id. (internal citations omitted). The Eleventh Circuit has underscored that "the burden of demonstrating fortuity is not a particularly onerous one." Lamadrid, 2014 U.S. App. LEXIS 9548, at *16-17.

9. If the insured establishes fortuity, the burden then shifts to the insurer to prove that an exclusion in the contract applies. Hollywood Flying Serv., Inc. v. Compass

Ins. Co., 597 F.2d 507, 508 (11th Cir. 1979); Great Lakes Reinsurance (UK) PLC v. Soveral, No. 05-80923, 2007 U.S. Dist. LEXIS 13261, at *7 (S.D. Fla. Feb. 27, 2007).

10. The burden to show that a loss was fortuitous is not a heavy one. Lamadrid, 2014 U.S. App. LEXIS 9548, at *16-17.

11. No one knows when the fuse blew or why it blew. This is consistent with an accident or a fortuitous event that is sudden, unexpected and unforeseen. There are various possibilities for what caused the bilge pump's fuse to blow, but this does not change the accidental and fortuitous nature of the event.

12. Exclusion "r" purportedly excludes coverage for the Kan-Do's "engines, mechanical and electrical parts" unless those parts are damaged by "an accidental external event such as collision, impact with a fixed or floating object, grounding, stranding, ingestion of foreign object, lightning strike or fire." Great Lakes asserted that it is entitle to judgment on the issue of coverage for the Kan-Do's engines, mechanical and electrical parts because the record does not support that these parts were damaged by an "accidental external force" as described in the Policy.

13. Kan-Do, Inc. asserted that the language in Exclusion "r" is inconsistent with the other language in Great Lakes' own all risk policy with coverage for accidental physical loss of or damage to a scheduled vessel. Kan-Do, Inc. further contends that any ambiguity should be held against the drafter, namely, Great Lakes, citing Fireman's Fund, Inc. Co. v. Tropical Shipping & Constr. Co., 254 F.3d 987, 1003 (11th Cir. 2001) ("We examine the language of the policy in its entirety, construing any ambiguity against the insurer.").

14. The Court is persuaded by Kan-Do, Inc.'s argument and determines that the provisions in "Coverage A" and Exclusion "r" are ambiguous and potentially inconsistent.

"Ambiguity exists in an insurance policy when its terms make the contract susceptible to different reasonable interpretations, one resulting in coverage and one resulting in exclusion." Id. While the policy covers accidental damage to the "hull, machinery, and equipment," in Coverage "A," it excludes damage to "engines, mechanical, and electrical parts" unless that damage was sustained by an "accidental external event." None of these operative terms are included in the "definitions" section of the Policy, and it appears that, giving these terms their plain and ordinary meaning, many of the same parts of the Kan-Do (for instance, the "mechanical parts" and "machinery" and "equipment") could reasonably fall under either Coverage "A" or Exclusion "r," thus creating ambiguity. This ambiguity must be construed against Great Lakes. Therefore, Exclusion "r" does not apply to their loss.

15. The damage sustained by the Defendant as a result of the covered loss is as follows:

   a. Hull: $77,622.00 less $3,105.00 deductible for a claim of $74,517.00, plus

   b. personal property under the Policy of $10,000.00 less $1,000.00 deductible for a claim of $9,000.00, plus

   c. salvage bill from Sea Tow of $10,400.00 and Port Tarpon Marina for $472.85.

   d. Total damages is $94, 389.85.

16. Defendant is entitled to pre-judgment interest from the date of the loss at the interest rate of .25% per year (rate of 1 year Treasury Bill). Wyatt v. Penrod Drilling Co., 735 F.2d 951, 956 (5th Cir. 1984) (stating pre-judgment interest may be awarded in a

"maritime claim."). Under the federal maritime law, "prejudgment interest is awarded almost as a matter of course in cases tried to a judge under general maritime principles." Id. at 956. Pre-judgment interest is $19.66 per month from the date of the loss. That calculates to $570.27.

17. The Clerk is directed to enter a judgment in favor of the Defendant Kan-Do Marine Research & Products, Inc. against Plaintiff Great Lakes Reinsurance (UK) PLC for the sum of $94, 960.12. Thereafter, the Clerk shall close the case.

**DONE** and **ORDERED** in the Chambers in Tampa, Florida, this 17th day of April, 2015.

*[Signature]*
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies to: All Counsel of Record

14